UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DONNELLE N. GUILLOT                    CIVIL ACTION

VERSUS                                 NUMBER: 10-01447

MICHAEL J. ASTRUE,                     SECTION: "R"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration terminating plaintiff's Social Security benefits.  (Rec. docs. 16, 18).

Donnelle N. Guillot, plaintiff herein, filed an application for Disability Insurance Benefits ("DIB") on December 17, 2001, with a protective filing date of October 2, 2001, alleging disability as of May 1, 2001. (Tr. pp. 57-59, 55-56).  In a "Disability Report Adult" form that was completed by plaintiff on December 6, 2001, the conditions resulting in her inability to work were identified as fatigue, weakness, severe cramps, bad headaches,

and bad constipation. (Tr. pp. 66-75). Those conditions reportedly rendered her unable to work on May 1, 2000 although she continued to function 1 hour in the morning and 1 hour in the afternoon driving a school bus. (Id.; tr. pp. 85-92). Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on March 11, 2002, following which she requested a hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. pp. 48-51, 52-54). Based upon the documentary evidence alone and without conducting a hearing, on April 24, 2002, that ALJ issued a written decision in which he concluded that plaintiff was disabled as of May 1, 2001. (Tr. pp. 39-46).

In early 2007, plaintiff was asked to provide updated information about her condition to the Administration to determine her continued eligibility to receive Social Security benefits (otherwise known as continuing disability review or "CDR"). 20 C.F.R. §404.1589. By way of a "Continuing Disability Review Report", plaintiff advised the Administration that her condition was unchanged, that she had suffered multiple attacks from Crohn's disease requiring Remicade infusions at the hospital and resulting in severe constipation rendering her unable to work. She also saw a psychiatrist monthly as well as a dermatologist for psoriasis and had been admitted to the hospital for bowel obstruction. In terms

2

of daily activities, plaintiff indicated that she slept a great deal due to internal bleeding, raised her 2 children, and did general house cleaning.  She expressed difficulty in preparing meals, shopping, walking, standing, lifting objects, and using her arms, hands, or fingers.  Due to Attention Deficit Disorder ("ADD"), she also had problems in concentrating, remembering, understanding/following directions, and completing tasks. (Tr. pp. 184-197).

On March 14, 2007, plaintiff completed a "Function Report-Adult" form that elicited information about how her conditions limited her activities.  There, plaintiff indicated that she was capable of feeding and bathing her children and pets, tending to her own personal needs, and preparing simple meals.  Household chores were done at a slow pace and plaintiff could drive and go shopping several times per week as well as tend to financial matters.  Plaintiff enjoyed reading and watching TV, spent time with friends and family weekly, and typically went to church or her children's functions twice per week.  Nearly all of her abilities were effected by her Crohn's disease and when she was having an attack there was not much that she could do.  Plaintiff's vision had also worsened as a result of the Remicade treatments. She estimated that she could walk for 2 blocks before needing to rest for varying periods of time depending on how bad her condition was.

A typical day consisted of getting her children, then ages 11 and 7, off to school, sleeping for a few more hours, doing laundry if she felt up to it, beginning dinner preparations, watching TV, doing some light household chores, and helping the children with their homework before retiring for the evening. (Tr. pp. 198-206).

On June 9, 2007, a Disability Examiner/Claims Representative reviewed plaintiff's file and determined that she was no longer disabled as of June 1, 2007. (Tr. pp. 141-142).  Formal notice advising plaintiff that her benefits would be terminated was issued on June 12, 2007. (Tr. pp. 144-146).  Plaintiff then requested reconsideration of that determination on June 24, 2007. (Tr. p. 147).  In a "Disability Report Appeal" form that she had completed on June 17, 2007, plaintiff indicated that her condition was not in remission and that she was then receiving more Remicade treatments. She was constantly fatigued, had chronic pain in her stomach sometimes rendering her unable to walk, had internal bleeding, and suffered from constipation or diarrhea most of the time. (Tr. pp. 207-213).

As part of the reconsideration process, a hearing before a Disability Hearing Officer ("DHO") was scheduled for November 6, 2007. (Tr. p. 152).  Plaintiff, however, failed to attend the hearing and the DHO issued a written decision in which he found that plaintiff was no longer disabled. (Tr. pp. 152-160).  On that

4

same day an Administration representative again found that plaintiff's disability ceased as of June 1, 2007 with formal notice denying plaintiff's request for reconsideration being issued on November 7, 2007. (Tr. pp. 143, 150-151). Plaintiff then filed a request for a hearing de novo before an ALJ on November 20, 2007. (Tr. pp. 164-165). Pursuant to that request, a hearing before a second ALJ went forward on October 24, 2008 at which plaintiff, who elected to proceed pro se, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 483-513). On February 2, 2009, the second ALJ issued a written decision in which she, too, concluded that plaintiff's disability ceased as of June of 2007. (Tr. pp. 18-28). After receiving additional evidence from an attorney who had by that time been retained by plaintiff, the Appeals Council ("AC") denied plaintiff's request for review of the ALJ's decision on March 30, 2010, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 12, 9-11). It is from that unfavorable decision that the plaintiff now seeks judicial review pursuant to 42 U.S.C. §405(g).

In her cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

> I.  THE FINDING THAT PLAINTIFF DOES NOT EQUAL A LISTING DOES NOT COMPORT WITH THE 20 C.F.R. §404.1594(f) TERMINATION EVALUATION PROCESS AND IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

II.  THE FINDING OF MEDICAL IMPROVEMENT DOES NOT COMPORT WITH THE 20 C.F.R. §404.1594 STANDARDS AND IS NOT SUPPORTED BY SUBSTANTIVAL EVIDENCE.

III. THE FINDING THAT MEDICAL IMPROVEMENT RELATES TO PLAINTIFF'S ABILITY TO WORK IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

II.  THE ALJ FAILED TO FULLY AND FAIRLY DEVELOP THE RECORD AND THE APPEALS COUNCIL FAILED TO ASSUME JURISDICTION IN THE PRESENCE OF NEW AND MATERIAL EVIDENCE.

(Rec. doc. 16-2, p. 13).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

1.  [t]here is no evidence of substantial gainful activity during the period at issue.

2.  [a]t the time of the comparison point determination, Claimant was deemed to be precluded from all substantial gainful activity due to Crohn's disease with chronic diarrhea and pain.

3.  [t]here has been medical improvement since the comparison point determination.

4.  [n]o exceptions to medical improvement apply in this case which would require continuation of disability.

5.  [c]urrent medical evidence indicates that Claimant has the following "severe" impairment(s): Crohn's disease, psoriasis, and psoriatic arthritis.

6.  [t]he current medical evidence does not show that any impairment or combination of impairments meets or equals the criteria of any impairment set forth in the Listing of Impairments at Appendix 1, Subpart P, Regulations Pt. 404.

7.  [c]laimant's allegations concerning her symptoms and

6

functional limitations are only partially credible.

8.    [c]laimant has the residual functional capacity to perform a limited range of light work with only occasional climbing of ladders, ropes, and scaffolds, and avoidance of even moderate exposure to respiratory irritants and workplace hazards.

9.    [w]ith the above residual functional capacity, Claimant is able to perform her past relevant work as [a] sales clerk, cashier, and companion/aide, at least as such work is generally performed in the national economy.

(Tr. pp. 27-28).

Judicial review of the Commissioner's decision to terminate Social Security benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion. <u>Jones v.</u>
<u>Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not
reweigh the evidence or try the issues <u>de novo</u>, nor may it
substitute its judgment for that of the Commissioner. <u>Cook v.</u>
<u>Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the
evidence are for the Commissioner to resolve, not the courts.
<u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

In termination cases like this one, the Commissioner may
discontinue Social Security benefits if substantial evidence
demonstrates that: (1) there has been medical improvement related
to an individual's ability to work and (2) the individual is now
able to engage in substantial gainful activity. 42 U.S.C. §423(f);
20 C.F.R. §404.1594(a). Medical improvement is defined as any
decrease in the medical severity of a claimant's impairment which
was present at the time of the most recent favorable medical
decision that the claimant was or continued to be disabled. 20
C.F.R. §404.1594(b)(1). The second part of the evaluation process
relates to the ability to engage in substantial gainful activity.
In making this determination, the Commissioner unitizes the 8-step
sequential analysis set forth in 20 C.F.R. §404.1594(f), as
follows:

> 1. is the claimant engaged in substantial gainful
> activity? (If so, the disability has ended).

2.   if not, does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1? (If so, the disability is continuing).

3.   if not, has there been medical improvement?

4.   if there has been medical improvement, is it related to the claimant's ability do work?

5.   if there has been no medical improvement, or if the medical improvement is not related to the claimant's ability to do work, is one of the exceptions to medical improvement applicable?   (If not, the disability is continuing).

6.   if there has been no medical improvement, or if the medical improvement is not related to the claimant's ability to do work, or if one of the first group of exceptions is applicable, is the combination of impairments severe? (If not, the disability has ended).

7.   if so, is the claimant able to engage in past relevant work? (If so, the disability has ended).

8.   if not, is the claimant able to perform other substantial gainful activity?

> See also Griego v. Sullivan, 940 F.2d 942, 944 n.1 (5th Cir. 1991).

"Under the medical improvement standard, the government must, in all relevant respects, prove that the person is no longer disabled." Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002)(citing 42 U.S.C. §423(f) and Griego, 940 F.2d at 943-44).

At the time of the administrative hearing that was held on October 24, 2008, plaintiff was 34 years of age, had attended

school through the twelfth grade, and had past relevant work experience as a salesperson, cashier, companion/aide, and part-time bus driver.   Plaintiff appeared at the hearing without representation and following questioning by the ALJ, elected to proceed pro se, signing a written waiver to that effect. The ALJ then turned to the documentary exhibits that were to be admitted into evidence at which point plaintiff questioned the accuracy of some of the information contained within the report of a consultative evaluation that had been performed on May 31, 2007. Specifically, plaintiff took exception with the examiner's report that she had a "mental issue" when she had none, that she had no eye problems when she in fact wore eyeglasses, and  with the overall cursory nature of the examination.  The ALJ nevertheless admitted the exhibits into evidence but indicated that plaintiff's concerns would be considered when determining the weight to be given to the report in question.  In addition to the waiver of representation form, plaintiff also signed authorizations allowing for the release of her additional medical records. (Tr. pp. 485-490).

Plaintiff was then sworn in and was questioned by the ALJ. Plaintiff lived with her husband with whom she had a 5-month old son and she had 2 other children, ages 12 and 7, from a previous marriage and for whom she received child support.  Her only other

10

income was her DIB, her husband did not contribute to the expenses of her 2 other children, and it appears that plaintiff may have been temporarily separated from her husband as he was having problems coping with her illnesses.   Health care was obtained through Humana and Medicaid.   Plaintiff testified that she was working part-time as a school bus driver when she first began receiving DIB but that she was no longer able to do so due to diarrhea and pain and had not work for 4 to 5 years.

In terms of healthcare providers, plaintiff was treated by Dr. Brenner, the gastroenterologist who diagnosed her with Crohn's disease, and Drs. Boe and Ackerman, the practitioners who diagnosed her with psoriatic arthritis two years earlier.   For her conditions, plaintiff had received Remicade infusions for her Crohn's disease and Humira injections and Prednisone for her psoriatic arthritis but those treatments had to be discontinued when she became pregnant for the third time.   However, plaintiff testified that she had actually received a Remicade treatment the previous day leaving her feeling nauseated at the time of the hearing.   She was prescribed Darvocet as needed, Lexapro, Valium as needed, and Phenergan for nausea. During her recent pregnancy, plaintiff testified that she had received weekly enemas to counter constipation but she was now suffering from diarrhea all the time. The consultative evaluator had reportedly told plaintiff that she

was the first patient she had known to have constipation with Crohn's disease.

When asked to enumerate the conditions affecting her ability to work, plaintiff identified Crohn's disease; psoriasis; psoriatic arthritis; eye, leg, and back pain; and, general pain throughout the body. During a Crohn's attack plaintiff experienced pain to her intestines, legs, feet, and head, made worse with cold weather. After receiving a Remicade infusion plaintiff would be nauseated and weak for 1 to 3 days. Plaintiff testified that she could microwave food and occasionally prepare a simple meal but that her mother did most of the cooking, her mother and daughter did the household chores, and her mother shopped and paid the bills. Plaintiff could drive only short distances due to the possibility of diarrhea and cramps. She testified to having diarrhea daily and to wearing Depends which sometimes leaked. Plaintiff estimated that she may have to take 9 to 10 bathroom breaks throughout the day, each of which might last 10 to 15 minutes or longer depending on whether it was for diarrhea or for constipation requiring the use of an enema. She tried to attend church on Sunday but needed ample bathroom access and she did little visiting with friends or relatives.

As for physical capabilities, plaintiff estimated that she could sit for 25 minutes but then her legs would hurt. She could

12

walk or stand for 15 minutes but then may get cramps and would have to lay down.  Most of her day was spent in the bathroom, on the sofa, or in bed.  Plaintiff could hardly carry her 12-pound infant before experiencing cramps and back pain.  She also complained of occasional pain to the right hand and the right side of her body was more prone to be painful then the left.  Attacks of Crohn's disease occurred 5 times per week for which she took Darvocet for stomach pain relief if laying down did not help. Plaintiff had difficulty concentrating due to ADD but admitted that she did not take Adderall as she should.  When asked why she failed to attend the hearing before the DHO plaintiff explained that her mother had lost the paperwork related to the proceeding.  She had not seen her doctors from Tulane since October of 2007 but she did have an appointment scheduled for the following Monday.  Plaintiff no longer saw a psychiatrist for her Lexapro or Adderall but instead obtained the drugs through her family doctor, Dr. Allen, whom she saw every few weeks.  At this point in the hearing a brief recess was taken to allow plaintiff to use the restroom.  Plaintiff's mother was given the option of testifying but she declined. (Tr. pp. 490-508).

Crystal Younger, a VE, was next to take the stand.  She first testified that plaintiff's previous jobs as a salesperson, cashier, and companion/aide were semi-skilled and were performed at the

13

light exertional level and that her past job as a part-time bus driver was a medium-level job with a skill level of "4". The ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who could occasionally lift/carry 20 pounds but could frequently lift/carry 10 pounds; could sit, stand, and/or walk for 6-hours per 8-hour day; could occasionally climb ladders/ropes/scaffolds but could frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; should avoid moderate exposure to fumes, odors, dust, gasses, poor ventilation, and work at unprotected heights or that involving dangerous machinery. In answer thereto, the VE testified that the individual described in the hypothetical question could perform plaintiff's past jobs as a salesperson, cashier, and companion. To the hypothetical question as originally framed the ALJ then added that the individual would require breaks and absences at unscheduled times throughout the day in excess of those that are normally allowed. With that added requirement the VE testified that the described individual would have difficulty maintaining employment. Plaintiff then took a second break to use the restroom.

Following the brief recess the ALJ posed a third hypothetical question to the VE which assumed the same basic information that was in the first hypo but the individual would be absent from work

from 1 to 3 days every 2 months.  In answer to that third hypothetical question the VE testified that the described individual would have difficulty maintaining employment. (Tr. pp. 508-512).  Following Ms. Younger's testimony plaintiff signed an additional authorization form allowing for the release of her medical records. (Tr. pp. 512-513).

The documentary evidence of record goes back to October 6, 2000 when plaintiff underwent a colonoscopy at the hands of Dr. Brenner.  That procedure revealed multiple ulcers in the ileum and ilocecal valve, hemorrhoids, and ileal Crohn's disease. The diagnosis was Crohn's disease. (Tr. pp. 100-106). An upper GI and small bowel series was performed on October 20, 2000 which was negative for the esophagus, stomach, and duodenum but revealed narrowing and irregular nodularity of the distal ileum consistent with the clinical history of Crohn's disease. (Tr. pp. 106-108). Plaintiff's condition was monitored via bloodwork over the next several months and on June 21, 2001, Dr. Brenner prescribed intravenous treatments of Remicade. (Tr. pp. 109, 112, 123-124). She subsequently underwent a 2-hour infusion of Remicade on June 25, 2001 with her weight at the time being measured at 148 pounds. (Tr. pp. 125-126).  As noted earlier, plaintiff filed her application for DIB on December 17, 2001 alleging disability as of May 1, 2001. (Tr. pp. 57-59).  On December 24, 2001, plaintiff

15

reported that she was then employed as a part-time school bus driver who worked 2 hours per day, 5 days per week. (Tr. pp. 85-92).

On February 11, 2002, plaintiff was consultatively evaluated Dr. Mittie Doyle of the Arthritis and Immunology Associates. Plaintiff recalled a history of severe cramping abdominal pain and bloody diarrhea while she was pregnant with her second child which was initially thought to be hemorrhoids.  However, her symptoms continued following childbirth and she was eventually referred to Dr. Brenner who diagnosed Crohn's disease.  Despite having received 2 Remicade treatments in the previous 6 months she continued to have chronic lower abdominal pain, intermittent vomiting and constipation, and bloody diarrhea, having bowel movements up to 5 times per day. Her condition was also complicated by an anal fissure and rectal ulcers and joint pain was associated with the use of Remicade.  Plaintiff estimated that she could lift up to 30 pounds, could sit for 1 hour, could stand for 2 hours, and could walk for one-half mile before needing to stop secondary to right lower quadrant pain.

Upon physical examination, plaintiff's weight was measured at 128.2 pounds and her blood pressure was 110/64. She had plaques over her elbows, scalp, and ear consistent with psoriasis. Plaintiff had right lower quadrant pain on deep palpation but the

16

spleen was not palpable. The functional assessment was normal. Dr. Doyle's impression was severe Crohn's disease requiring IV Remicade, chronic headaches, psoriasis, and anemia. Based on the results of her evaluation the doctor felt that plaintiff would have difficulty with any type of heavy physical work. In addition, because of her intermittent abdominal pain and active Crohn's disease requiring close medical follow-up and constant access to a restroom, Dr. Doyle opined that plaintiff may have difficulty maintaining gainful employment. (Tr. pp. 132-128).

On March 4, 2002, an Administration employee reviewed plaintiff's file and set forth her findings in a "Physical Residual Functional Capacity Assessment" form, finding plaintiff to be capable of performing light-level work. (Tr. pp. 133-140). As the ability to do such work would not preclude plaintiff from performing her past job as a bus driver, disability was not felt to be established. (Tr. p. 93). Without conducting an administrative hearing and on the basis of the record above, on April 24, 2002, the first ALJ assigned to plaintiff's case issued his favorable decision awarding disability benefits as of May 1, 2001. (Tr. pp. 39-46). In doing so, the ALJ gave the Administration employee's assessment of plaintiff's capabilities diminished weight because the employee failed to account for plaintiff's need for almost constant, unpredictable access to a restroom throughout the day.

(Tr. p. 44).

On May 17, 2005, plaintiff presented herself to the East Jefferson General Hospital ("EJGH") Emergency Room ("ER") with complaints of right lower quadrant pain that was unrelieved with Ibuprofen.  She also reported some nausea and vomiting which by then had resolved.  Her last bowel movement was the previous evening and was normal. Plaintiff was due for another Remicade treatment and was to follow-up with Dr. Brenner in that regard.  On physical examination, plaintiff's gastrointestinal area was soft and she had diffuse mild tenderness to palpation.  Bowel sounds were positive. Various tests were run including x-rays of the abdomen which revealed no signs of acute abdominal process and no change from x-rays that were reportedly taken on March 15, 2004. Other labwork was essentially normal.  While at the ER, plaintiff was administered IV Morphine, Phenergan, and fluids.  Those modalities proved to be effective and plaintiff was discharged with a diagnosis of acute abdominal pain. (Tr. pp. 223-227).

Plaintiff was next seen at the North Oaks Medical Center ("NOMC") ER on July 8, 2005 for complaints of numbness and tingling from the mid left thigh to the foot since the previous day, blisters to the inside of the mouth and areas of the chin that were spreading, and nausea and vomiting at night with her pain being described as a level of "9".  She was treated with Tylenol, IV

fluids, Morphine, Phenergan, and Levaquin and her pain decreased to a level of "5". The diagnosis was a urinary tract infection and Crohn's disease and plaintiff was discharged home in stable condition with prescriptions for Levaquin and Darvocet. (Tr. pp. 291-303).

Plaintiff returned to the NOMC ER on July 11, 2005 with complaints of a fever, body aches, and neck, back, and leg pain. The pain was described as constant and at a level of "10". Plaintiff was treated with Darvocet-N and Claritin and her pain decreased to a level of "3". She was diagnosed with a urinary tract infection that had resolved and sinusitis and was discharged home with 3 prescriptions. Chest x-rays taken at the time were normal. (Tr. pp. 271-284). Plaintiff was seen again at the NOMC ER on July 30, 2005 for complaints of abdominal pain since the previous day with vomiting. Various tests were run including abdominal x-rays which revealed probable splenomegaly and possible fecal impaction. A CT scan of the pelvis with contrast demonstrated an abnormal distal ileum compatible with Crohn's disease and dilatation of the small bowel compatible with small bowel obstruction. Plaintiff was treated with IV fluids, Morphine, Phenergan, Solu-Medrol, and Dilaudid. Plaintiff obtained some pain relief and was ultimately discharged home with prescriptions for Dilaudid and a Medrol Dosepak and with a diagnosis of abdominal

pain and Crohn's disease. (Tr. pp. 254-270).

On August 20, 2005, plaintiff was prescribed Prozac, Lexapro, and Adderall by Dr. Minati Biswas, a psychiatrist. (Tr. pp. 309-310). Plaintiff next presented to the NOMC ER on August 16, 2006 with complaints of abdominal pain, nausea, and vomiting since the previous day but no diarrhea. Following evaluation the decision was made to admit plaintiff for intravenous fluid support and steroids. On physical examination, plaintiff's abdomen was soft with minimal tenderness in the right lower quadrant. The admission diagnosis was Crohn's disease with ileus and psoriasis. Once again, plaintiff was treated with IV fluids, Phenergan, Morphine, and Dilaudid. An abdominal x-ray taken during this admission showed some air fluid levels in the small bowel but otherwise produced non-specific findings. By the next morning plaintiff was feeling much better and her inpatient admission included treatment with Remicade and Flagyl. Plaintiff was ultimately discharged on August 19, 2006 with a prescription for Prednisone and instructions to follow-up with her doctor in 2 weeks. (Tr. pp. 239-253).

Plaintiff returned to Dr. Biswas on December 16, 2006 and was diagnosed with inattentive type ADHD. She was instructed to continue on her Adderall and Lexapro. (Tr. p. 307). Plaintiff was next seen at the NOMC ER on January 18, 2007 after waking up unable to see and with burning to both eyes. The medical records that

20

were generated that day indicate that plaintiff had received an ultraviolet light treatment for her psoriasis the previous day and had not worn eye protection.  Plaintiff's eyes were irrigated and she was given Darvocet for pain relief along with prescriptions for Darvocet and an ophthalmic solution.   The impression was a UV radiation burn to both eyes. (Tr. pp. 229-238). On January 23, 2007, plaintiff was said to be doing okay upon a return visit to Dr. Biswas.  The diagnosis was depression disorder, not otherwise specified, and ADHD.  She was to continue with the Adderall and Lexapro and was additionally prescribed Valium. (Tr. p. 306). Plaintiff was still characterized as doing okay on March 6, 2007 but she reported that she was no longer working on a regular basis. The diagnosis was the same as the previous occasion and plaintiff was continued on her 3 medications. (Tr. p. 305).  On March 14, 2007, plaintiff completed the "Function Report-Adult" form that was described earlier as part of the Administration's CDR. (Tr. pp. 198-206).

In a brief medical report that was signed on March 20, 2007, Dr. Mary Lou Applewhite recalled having treated plaintiff for psoriasis confined to the lower legs, mainly the left leg, which did not result in any limitations. (Tr. p. 311).  On April 24 and May 2, 2007, arrangements were made for an upcoming Remicade treatment plaintiff was to receive, including pre-treatment

21

tuberculin testing. (Tr. pp. 354-356, 359-362, 364-365). On May 4, 2007, plaintiff was administered another dose of IV Phenergan and Remicade. Her weight was recorded at 145 pounds on this date. (Tr. p. 363).

Plaintiff was consultatively evaluated by Dr. Miljana Mandich on May 17, 2007. Despite reportedly receiving Remicade effusions every 2 months for the previous 5 years, plaintiff complained of experiencing attacks of generalized abdominal cramping from 1 to 4 times per week. She did not get diarrhea but instead suffered from chronic constipation resulting in fecal impactions on several occasions. Glycerin suppositories were used twice per week and plaintiff would not have a bowel movement without them. Plaintiff reported that the Crohn's disease was centered in her small intestines and rectum for which she had taken steroids in the past. She was observed to have scattered psoriasis plaques on her knees, lower legs, and scalp. Plaintiff received phototherapy treatments about 3 times per week for her psoriasis and was soon to be placed on Methrotrexate. She had been hospitalized for Crohn's in August of 2006 but had been treated at the ER on various occasions with Morphine and Remicaid. Plaintiff had ADD as a child and had been restarted on medication for that about 5 years earlier. Medications at the time included Amphetamine salts once per day, Lexapro once per day, Nasal Cort spray once per day, and Darvocet-N

22

as needed for pain. Plaintiff had worked as a bus driver until the end of 2003 and she was able to engage in all activities of daily living without assistance.

As part of her evaluation, Dr. Mandich performed a physical examination of plaintiff which was essentially unremarkable except for scattered chronic plaques of psoriasis on her knees, lower legs, and scalp.  The diagnoses were: 1) Crohn's disease, 2) ADD, and 3) psoriasis.  In the summary portion of her report, Dr. Mandich remarked that plaintiff had never suffered from diarrhea or bloody stools but instead had chronic constipation prohibiting bowel movements unless she took a glycerin suppository.  Plaintiff had attacks of abdominal cramps at a rate of 1 to 4 times per week which were sometimes relieved by a heating pad and other times required ER treatment.  In conclusion, the doctor stated that plaintiff's "... physical examination is completely normal at this time except for several chronic plaques of psoriasis on her knees, lower leg and one on her scalp.  The abdomen is soft and non-tender at this time." (Tr. pp. 312-318).

On June 5, 2007, an Administration Reviewer and an Examiner made a formal request for medical advice regarding plaintiff's condition. (Tr. p. 319).  The following day, Dr. Louis Balart, an Administration Medical Consultant, completed a "Continuing Disability Review (CDR Worksheet)" form wherein he indicated that

plaintiff had experienced medical improvement. Dr. Balart explained that plaintiff had previously been awarded DIB based on gastrointestinal disorders and was at that time restricted to less than sedentary work activity due to abdominal pain and bloody bowel movements up to 5 times per day requiring constant access to a restroom.  However, the disabling condition was now identified as Crohn's disease; plaintiff had only one hospitalization within the previous year for abdominal pain; and she no longer complained of diarrhea but was now complaining of constipation. (Tr. p. 320).  As part of the CDR process, Dr. Balart also completed the Administration's form denominated "Physical Residual Functional Capacity Assessment." There, Dr. Balart found that plaintiff's allegations were only partially credible, that she had experienced medical improvement, and that she was now capable of performing light-level work. (Tr. pp. 321-328).

On June 7, 2007, Dr. Doris LeBlanc, an Administration Psychiatric Medical Consultant, completed a "Psychiatric Review Technique" form in which she concluded that plaintiff suffered form an affective disorder but that it was not a severe impairment. While Dr. Biswas had diagnosed plaintiff with a depressive disorder and ADHD, she had not been hospitalized for any psychiatric disorder. Her mental status was within normal limits when she was seen by Dr. Mandich, and the limitations in her activities were

physical rather than mental. (Tr. pp. 329-343).

Plaintiff received another infusion of Remicade and Phenergan on July 2, 2007 with her weight being measured at 135 pounds on that date. Since her most recent treatment, plaintiff's pain had increased and she had suffered a Crohn's attack. (Tr. pp. 357-358). On August 10, 2007, plaintiff presented herself to the NOMC ER with complaints of a sore throat, nausea, and vomiting since the previous day. Plaintiff rated her pain as a "10" and she had been treated 2 weeks earlier for a spider bite on her left jaw. Various tests were run including a chest x-ray which revealed no significant abnormality and an x-ray of the abdomen which demonstrated mild ileus. Plaintiff was treated with IV Phenergan, Morphine, and Cipro and was diagnosed with abdominal pain, nausea and vomiting, and a history of Crohn's disease. Additional Cipro and Phenergan were prescribed at the time of discharge. (Tr. pp. 437-455).

On October 24, 2007, plaintiff was evaluated by Dr. Lindsey Ackerman, a dermatologist, having previously been seen by her on August 27, 2007. Plaintiff suffered from psoriasis and psoriatic arthritis that were coexistent with her Crohn's disease. The doctor began treating plaintiff with Humira injections and Methrotrexate but the latter drug was discontinued secondary to nausea and vomiting. Plaintiff's Crohn's disease was relatively

25

well-controlled but she did suffer from incapacitating flares on occasion.  Despite being on birth control medication, plaintiff had recently become pregnant and consideration was given to substituting Asacol for the Humira.  Plaintiff reported otherwise feeling okay but she did have persistent joint pain and cutaneous lesions causing her to question the effectiveness of Humira. Plaintiff was in no acute distress but appeared somewhat uncomfortable, being notably bothered by the persistence of her joint pain and cutaneous disease and concerned about the recurrence and exacerbation of her Crohn's disease during her pregnancy.  She was advised to discontinue the use of Humira during her pregnancy and UV therapy was considered as an option if she flared after stopping the drug.   Low dose Prednisone was also considered an option. Due to the combination of plaintiff's conditions and the complicating fact of her pregnancy, Dr. Ackerman did not think it prudent that plaintiff return to work in the near future.   Further treatment was deferred pending plaintiff's consultation with a high-risk OB/GYN and with Dr. Brenner. (Tr. pp. 375-376).  On that same date Dr. Ackerman authored a "To Whom It May Concern" letter reiterating her opinion about plaintiff's ability to work at that point in time. (Tr. p. 377).

On November 15, 2007, plaintiff completed a "Disability Report-Appeal" form in which she indicated that her condition had

recently worsened and that she was now having severe cramps and severe diarrhea everyday with quantities of blood and mucus.  With the discontinuation of her medications due to her pregnancy, there were times when plaintiff could not get out of bed due to the chronic pain caused by her Crohn's disease and psoriatic arthritis. (Tr. pp. 214-220).

Plaintiff returned to Dr. Ackerman for a follow-up evaluation on November 28, 2007, reporting remarkable improvement to her cutaneous disease since discontinuing the Humira and Methethotrexate.  However, the pain in her joints, specifically the joints in the lower back, hips, knees, and ankles, was nearing an excruciating level.  Plaintiff was then taking Asacol and Tylenol for pain, Lexapro had been discontinued, and Prednisone and/or Humira were not ruled out entirely in the future.  On physical examination, plaintiff only had a small psoriasiform plaque on the right knee that was minimally hyperkeratotic but well-defined with erythema at the base.  Plaintiff was currently able to tolerate the level of pain she had on a day-to-day basis, a "6" at rest but an "8" with ample movement, and was not interested in pursuing any anti-inflammatory medications.  Her condition was to be monitored. (Tr. p. 374).

Plaintiff experienced an exacerbation of her Crohn's disease on December 7, 2007 that was manifested by midline lower abdominal

27

pain radiating to both lower quadrants.  She additionally suffered from a productive cough for the previous 2 weeks as well as a chronic yeast infection secondary to the use of antibiotics.  There was mild suprapubic tenderness on physical examination. Plaintiff experienced some pain relief with Morphine and Phenergan and was admitted to the hospital where she was treated with IV Solu-Medrol and Asacol tablets.  By December 9, 2007, plaintiff achieved total stabilization of her exacerbation and was discharged home with a low fat diet and a Medrol Dosepak and instructions to follow-up with Dr. Brenner in 1 week. (Tr. pp. 418-436).

On April 21, 2008, plaintiff returned to the NOMC ER complaining of a bowel obstruction.  She was eight months pregnant at the time.  Plaintiff was admitted to the hospital on a short-term basis where she was treated with IV fluids and Tylenol and was administered soapsuds enemas until her fecal impaction cleared. She was discharged the following day with a diagnosis of fecal impaction and Crohn's disease. (Tr. pp. 409-417).  Plaintiff received further soapsuds enemas at NOMC on April 30, 2008 for treatment of constipation. (Tr. pp. 402-408).  More such treatment was administered on May 7, 2008.  The assessment was constipation related to Crohn's disease. (Tr. pp. 395-401).

Plaintiff returned to NOMC on May 21, 2008 for further monitoring of her pregnancy in light of her recent exacerbations of

Crohn's disease. Given her numerous bouts of severe constipation and increasing pain, the decision was made to admit plaintiff to the hospital for pregnancy induction.  Labor was induced secondary to Crohn's on May 23, 2008 following which plaintiff received a tubal ligation.  She was discharged on May 25, 2008. (Tr. pp. 383-394). Plaintiff was next seen by Dr. Brenner on August 13, 2008 who noted that she had suffered severe postpartum depression.  She also had some abdominal pain, treated with Darvocet, and she expressed a desire to resume Remicade treatments.  There was some abdominal tenderness on physical examination.  The assessment was regional enteritis of the small and large intestines.  Various tests were ordered and plaintiff's prescription for Darvocet was adjusted. (Tr. pp. 479-482).  Among the tests that were ordered was a colonoscopy that was performed by Dr. Brenner on August 28, 2008. A stenosis of benign intrinsic appearance 1 centimeter in length was located at the terminal ileum which could not be traversed and the exam thus could not be completed.  The impression was normal mucosa in the rectum and the whole colon and stenosis at the terminal ileum but an otherwise normal colonoscopy to the cecum and terminal ileum. (Tr. pp. 477-478).

On October 23, 2008, plaintiff was administered an IV Phenergan and Remicade infusion. (Tr. pp. 472-476).  As noted earlier, the hearing _de novo_ before the second ALJ would go forward

the following day, October 24, 2008. (Tr. pp. 483-513).  That ALJ subsequently issued her unfavorable decision terminating plaintiff's Social Security benefits on February 2, 2009. (Tr. pp. 18-28).  Plaintiff would be seen by Dr. Brenner one final time on March 11, 2009.  She complained of some abdominal pain, some constipation, and blood in her stool.  Bloodwork done in August of 2008 revealed her to be mildly anemic.  By this time plaintiff had discontinued Remicade treatments but was now having problems with her legs and arms which was suspected to be psoriatic arthritis. An appointment with her dermatologist was scheduled for the following week.  Medications included Adderall, Darvocet-N, Lexapro, Light Treatment, and Asacol.  A physical examination of the abdomen revealed it to be mildly tender in the right lower quadrant.  The assessment was regional enteritis of the small and large intestines.  Further testing was ordered and plaintiff was prescribed Prednisone in addition to her other medications. (Tr. pp. 468-469).

As noted earlier, plaintiff challenges the Commissioner's decision to terminate DIB on 4 grounds.  In the first of those, plaintiff argues that the ALJ erred in finding that she did not suffer from a condition set forth in the Listing of Impairments, more specifically Sections 5.06 and 8.05.  Plaintiff also alleges that the ALJ failed to comply with the 8-step termination

30

evaluation process mandated by 20 C.F.R. §404.1594(f) in that she made her Listing-level severity inquiry only after finding that plaintiff had experienced medical improvement that was related to her ability to work.  As for the latter contention, "[p]rocedural perfection in administrative proceedings is not required ... unless the substantial rights of a party have been affected." Mays v. Bowen, 837 F.2d 333, 334 (5th Cir. 1988).  In the present case, the ALJ properly recited the 8-step evaluation process at the outset of her decision but applied the steps somewhat out of order after discussing the evidence before her. (Tr. pp. 22, 24-28).  For plaintiff to prove that her substantial rights have been affected, she must demonstrate that the ALJ erred in finding that her condition did not satisfy or equal the criteria set forth in Sections 5.06 and 8.05 of the Listing of Impairments.

Section 5.06 of the Listing of Impairments provides that an individual will be considered presumptively disabled if she suffers from:

> 5.06 *Inflammatory bowel disease (IBD)* documented by endoscopy, biopsy, appropriate medically acceptable imaging, or operative findings with:
>
> A. Obstruction or stenotic areas (not adhesions) in the small intestine or colon with proximal dilatation, confirmed by appropriate medically acceptable imaging or in surgery, requiring hospitalization for intestinal decompression or for surgery, and occurring on at least two occasions at least 60 days apart within a consecutive 6-month period;

OR

B. Two of the following despite continuing treatment as prescribed and occurring within the same consecutive 6-month period:

    1. Anemia with hemoglobin of less than 10.0 g/dL, present on at least two evaluations at least 60 days apart; or
    2. Serum albumin of 3.0 g/dL or less, present on at least two evaluations at least 60 days apart; or
    3. Clinically documented tender abdominal mass palpable on physical examination with abdominal pain or cramping that is not completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or
    4. Perineal disease with a draining abscess or fistula, with pain that is not completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or
    5. Involuntary weight loss of at least 10 percent from baseline, as computed in pounds, kilograms, or BMI, present on at least two evaluations at least 60 days apart; or
    6. Need for supplemental daily enteral nutrition via a gastrostomy or daily parenteral nutrition via a central venous catheter.

Plaintiff is correct that Crohn's disease is a form of inflammatory bowel disease that is covered by Listing 5.06.  See Listing 5.00E(1).  When comparing the results of the colonoscopies performed by Dr. Brenner on October 6, 2000 and August 28, 2008, the Court first notes that the former included a specific diagnosis of ileal Crohn's disease while the latter results were interpreted as showing stenosis at the terminal ileum.  Nevertheless, the ALJ

found that plaintiff suffered from severe impairments in the form
of Crohn's disease, psoriasis, and psoriatic arthritis. Plaintiff
is also correct that a CT scan of the pelvis that was done on July
30, 2005 demonstrated an abnormal distal ileum compatible with
Crohn's disease and dilatation of the small bowel compatible with
small bowel obstruction. Stenosis of the terminal ileum obstructing
the passage of the scope was also shown through the second
colonoscopy that was performed by Dr. Brenner. To satisfy the
criteria of Listing 5.06A, however, a claimant must show that the
obstruction of stenotic areas required hospitalization for
intestinal decompression or for surgery on at least 2 occasions at
least 60 days apart within a consecutive 6-month period. As no
such showing has been made here, all of the criteria of Listing
5.06A have not been satisfied.

    To satisfy the criteria of Listing 5.06B, a claimant must have
suffered from 2 of the 6 enumerated symptoms which continued
despite prescribed treatment and which occurred within the same
consecutive 6-month period. Of those 6, plaintiff argues that she
suffers from anemia at the level required by Section 5.06B(1),
abdominal pain that was non-responsive to narcotic pain medication
as prescribed by Section 5.06B(3), and weight loss as described in
Section 5.06B(5). With respect to anemia, plaintiff cites the
results of various blood tests as well as Dr. Doyle's diagnosis of

anemia on February 11, 2002; a "Physical Residual Functional Capacity Assessment" form that was completed on March 4, 2002 in which anemia was identified as a secondary diagnosis; and, Dr. Brenner's note from March 11, 2009 in which he referred to labwork from August of 2008 as indicative of mild anemia and referenced a medical history of anemia. What plaintiff overlooks, however, is that Section 5.06B(1) requires not only the existence of anemia but "[a]nemia with hemoglobin of less than 10.0 g/dL, present on at least two evaluations at least 60 days apart, ..." Of all the bloodwork test results cited by plaintiff, only one of those, results from October 2, 2000, are below the required level. (Tr. p. 97). Moreover, the date on which that testing was conducted was prior to the alleged disability onset date and long before the start of the Administration's CDR process. The criteria of Section 5.06B(1) has not been established here.

In an attempt to satisfy the criteria of Section 5.06B(6), plaintiff cites her weight on six separate dates beginning with June 21, 2001 and ending with March 11, 2009. Admittedly, plaintiff's weight was measured at 148 pounds on June 21, 2001 and it had dropped to 128.2 pounds when she was consultatively evaluated by Dr. Doyle on February 11, 2002. Those dates, however, were prior to the award of benefits on April 24, 2002 and were presumably part of the evidence that led to that favorable

34

decision.    In  any  event,  those  dates  were  well  prior  to  the
relevant  time  period  at  issue  in  this  case.    Plaintiff  also  cites
her  weight  of  143.5  pounds  on  July  8,  2005  and  her  stated  weight  of
131  pounds  on  July  30,  2005  as  adequate  to  establish  listing-level
severity.    Those  2  dates  are  not  sufficiently  separated  by  time  as
Section  5.06B(5)  requires.    Remaining,  then,  are  plaintiff's  weight
of  170  pounds  on  August  13,  2008  and  her  weight  of  153  pounds  on
March  11,  2009.    Those  dates  are  subsequent  to  the  CDR  process;
indeed,  the  latter  date  is  after  the  issuance  of  the  ALJ's  decision
on  February  9,  2009.    Moreover,  what  Section  5.06B(5)  requires  is
a  baseline  weight  measurement  on  one  date  and  a  loss  of  weight
subsequent  thereto  on  two  evaluations  occurring  at  least  60  days
apart.    That  showing  has  not  been  made.    Even  assuming  that
plaintiff  has  sufficiently  established  tender  abdominal  mass  with
abdominal  pain  as  required  by  Section  5.06B(3),  that  would  only
establish  the  existence  of  1  of  the  2  symptoms  that  Section  5.06B
requires.    Listing-level  severity  has  not  been  established  here.

Plaintiff  additionally  argues  that  her  condition  satisfies  the
criteria  of  Section  8.05  due  to  her  psoriasis.    That  listing
requires  proof  of  "...  extensive  skin  lesions  that  persist  for  at
least  3  months  despite  continuing  treatment  as  prescribed."
(Emphasis  added).    In  support  of  this  allegation,  plaintiff  again
points  to  the  consultative  evaluation  report  of  Dr.  Doyle  but  that

35

pre-dates the relevant time period at issue. Other cited references to psoriasis include a report generated during plaintiff's admission at NOMC in August of 2006 but the extent of the lesions is not described. Dr. Appelwhite's report of March 20, 2007 confirmed the existence of psoriasis which was confined to the left leg but it was not believed to result in any impairment. Dr. Mandich's consultative evaluation report indicated that the results of her examination were normal except for several plaques on the knees, lower legs, and one on the scalp.  Plaintiff had plaques to her knees and anterior lower extremities when she was seen by Dr. Ackerman on October 24, 2007 and the use of Humira was discontinued due to her pregnancy.  By November 28, 2007, Dr. Ackerman stated that there had been "remarkable improvement" to plaintiff's cutaneous disease since discontinuing prescribed medication leaving her with only a small plaque on the right knee.  The Court is unable to characterize the foregoing medical reports as evidence of "extensive lesions" persisting for 3 months despite prescribed treatment. The criteria of Listing 8.05 has not been proven here.

Alternatively, plaintiff argues that the record contains evidence of other Crohn's-related findings that are at least of comparable medical equivalence to that required by Section 5.06. Plaintiff reported to Dr. Mandich on May 17, 2007 that she had received Remicade treatments every 2 months for the previous 5

years but the record contains no documentary proof establishing that such treatment was actually administered at that frequency. Plaintiff cites a Remicade infusion on June 25, 2001, well before the relevant time period, and the other cites are simply to 3 pharmacy work order/compounding records rather than records of actual Remicade infusions. The administration of anti-nausea medication does not equate with medical equivalence. Plaintiff testified to Remicade side-effects of severe fatigue and nausea for 1 to 3 days following each treatment but none of the doctors' reports contain any complaints about medication side-effects.

While plaintiff has undoubtedly received ER treatment for exacerbations of Crohn's on several occasions, those have largely been sporadic during the period at issue. The treatment that she received on May 17, 2005 was given in the ER rather than on an inpatient basis and her admission on April 21, 2008 was only for a short-term administration of fluids and an enema. Aside from the complaints of constipation that she voiced to Dr. Mandich on May 17, 2007 and those that she relayed to Dr. Brenner on March 11, 2009 when Remicade had been discontinued, the treatment that she received for that condition was largely confined to the latter portions of her pregnancy when she was off her regular medications. The evidence relied upon by plaintiff does not rise to that level of significance equal to hospitalizations for intestinal

37

decompression or surgery as required by Section 5.06A or for the existence of two of the six enumerated symptoms of the nature and frequency described in Section 5.06B.[1]

In her second challenge to the Commissioner's decision plaintiff alleges that the ALJ's finding of medical improvement does not comport with the standards enunciated in §404.1594 and is not supported by substantial evidence. As noted earlier, medical improvement is defined as any decrease in the severity of a claimant's impairment which was present at the time of the most recent favorable medical decision that the claimant was or continued to be disabled (otherwise known as the comparison point decision or determination, "CPD"). 20 C.F.R. §404.1594(b)(1). Whether such changes have occurred is determined by a comparison of the prior and current medical evidence. 20 C.F.R. §404.1594(c)(1).

The Court recalls that plaintiff underwent a colonoscopy on October 6, 2000 which resulted in a diagnosis that included ileal Crohn's disease. Further testing weeks later revealed narrowing and irregular nodularity of the distal ileum consistent with Crohn's. Plaintiff was then started on Remicade and received her

---

[1] A finding of medical equivalence generally requires greater medical expertise than that possessed by the ALJ. <u>Goodrich v. Sullivan</u>, 1992 WL 188812 at *4 (D. Arz. Jan. 27, 1992). After reviewing the evidence of record, Dr. Balart found on June 6, 2007 that neither listing-level severity nor medical equivalence had been established. (Tr. p. 320).

first treatment on June 21, 2001.  After filing her application for DIB, plaintiff was consultatively evaluated by Dr. Doyle, a practitioner who was presumably of a conservative nature. Plaintiff reported to Dr. Doyle a history of severe, crampy abdominal pain accompanied by bloody diarrhea while she was pregnant with her second child.  Despite allegedly receiving 2 Remicade treatments in the previous 6 months, she continued to suffer from abdominal pain, vomiting, constipation, and bloody diarrhea with bowel up to 5 times per day.  Dr. Doyle apparently found plaintiff to be fully credible and accepted the reported frequency of bowel movements as true, opining that plaintiff would have difficulty maintaining employment due to her need for constant access to a restroom.  Citing only Dr. Brennan's prescription for Remicade on June 21, 2001 and Dr. Doyle's report, the ALJ, too fully credited plaintiff's need for almost constant, unpredictable access to a restroom as sufficiently eroding the base of sedentary work so to as to justify an award of DIB. The Court notes that between June 25, 2001 and February 11, 2002, plaintiff had lost nearly 20 pounds.

Following the award of benefits on April 24, 2002, the record contains no records documenting any treatment plaintiff may have received until 3 years later on May 17, 2005.  At that time she presented to the EJGH ER with complaints of right lower quadrant

pain and nausea/vomiting which had resolved. Her last bowel movement the previous evening had been normal. Although there was diffuse mild tenderness to palpation of the GI area, abdominal x-rays revealed no signs of acute abdominal process. The diagnosis was acute abdominal pain. Plaintiff next received ER treatment at NMOC on July 8 and 11, 2005 primarily for a urinary tract infection and sinusitis. She returned to the NOMC ER on July 30, 2005 with complaints of abdominal pain since the previous day and vomiting. Testing done at the time produced results compatible with Crohn's disease and dilatation of the small bowel consistent with small bowel obstruction. Plaintiff was treated with IV medications and was discharged with a diagnosis of abdominal pain and Crohn's disease.

The next medical treatment plaintiff received for her Crohn's disease was almost a year later on August 16, 2006. At that time plaintiff was seen at the NOMC ER for complaints of abdominal pain, nausea, and vomiting since the previous day but with no diarrhea. There was minimal tenderness to the right lower quadrant. Plaintiff was admitted to the hospital with a diagnosis of Crohn's disease with ileus and psoriasis and was treated with IV fluids, pain medication, and steroids over the next 2 days. Abdominal x-rays revealed air fluid levels in the small bowel but were otherwise non-specific. Plaintiff was next seen at the NOMC ER on

40

January 18, 2007 for treatment of a UV radiation burn to the eyes. On March 14, 2007, plaintiff completed the Administration's "Function Report-Adult" in which she described a fairly normal range of daily activities which she could perform, albeit at a slow pace.

On March, 20, 2007, Dr. Appelwhite recalled having treated plaintiff for psoriasis to the lower legs, mainly the left, which was not believed to result in any limitations.  Another Remicade treatment was administered on May 4, 2007.  Plaintiff would then be consultatively evaluated by Dr. Mandich on May 17, 2007, advising the doctor that she had received Remicade infusions every 2 months for the prior 5 years and suffered from attacks of abdominal cramping at a rate of 1 to 4 per week.  She no longer suffered from diarrhea but instead had constipation with fecal impactions on several occasions.  Without the use of glycerine plaintiff would not have a bowel movement.  Her abdomen was soft and non-tender upon physical examination, the results of which were essentially normal except for some scattered psoriasis plaques.

On June 6, 2007, Dr. Balart reviewed plaintiff's file and found that her condition did not meet or equal the criteria of any of those set forth in the Listing of Impairments and that she had experienced medical improvement.  The rationale behind that opinion was that at the time of the CPD in April of 2002, plaintiff

41

experienced abdominal pain and bloody bowel movements up to 5 times per day and required constant access to a restroom.  By comparison, plaintiff had only one hospitalization in the previous year for abdominal pain and was no longer complaining of diarrhea but was instead suffering from constipation.  Plaintiff was assessed to be capable of light-level work and her allegations were deemed to be only partially credible.  Plaintiff underwent another Remicade treatment on July 2, 2007.  She was next seen at the NOMC ER on August 10, 2007 for a sore throat, nausea, and vomiting since the previous day.  Abdominal x-rays revealed mild ileus.  Plaintiff was treated with IV medications and was discharged with a diagnosis of abdominal pain, nausea, vomiting, and a history of Crohn's.

Plaintiff was seen by Dr. Ackerman on October 24, 2007 for monitoring of her psoriasis and psoriatic arthritis secondary to Crohn's disease.  She had recently become pregnant and described her Crohn's as relatively well-controlled although she did have occasional incapacitating flare-ups.  Methrotrexate had already been discontinued due to nausea and vomiting and Humira was also to be stopped due to the unknown risk that it posed to plaintiff's pregnancy.  In light of the combination of plaintiff's conditions and the anticipated effect of the discontinuation of her medication, combined with the complicating factor of her pregnancy, Dr. Ackerman did not think it was prudent for plaintiff to return

to work in the near future.  Despite stopping her medications, plaintiff reported remarkable improvement to her cutaneous disease when she returned to Dr. Ackerman on November 28, 2007 although she now had excruciating joint pain which she said she could tolerate. Medications consisted of Asacol and Tylenol and the use of anti-inflammatories was declined.

Plaintiff experienced an exacerbation of Crohn's on December 7, 2007 accompanied by midline lower abdominal pain radiating to both lower quadrants.  On physical examination there was mild suprapubic tenderness.  Plaintiff was treated with IV pain medication and steroids and was discharged home in stable condition 2 days later. She returned to the NOMC ER on April 21, 2008 complaining of bowel obstruction.  Being 8 months pregnant at the time, plaintiff was admitted on a short-term basis where she was treated with IV fluids and Tylenol and was given soapsuds enemas. The discharge diagnosis was fecal impaction and Crohn's disease. Further enemas were administered on April 30 and May 7, 2008 to relieve plaintiff's constipation.  On May 21, 2008, plaintiff's pregnancy was evaluated in light of her Crohn's disease and the decision was made to induce labor.

Approximately 3 months after the birth of her third child plaintiff returned to Dr. Brenner with complaints of severe postpartum depression and abdominal pain.  She expressed a desire

to resume Remicade treatments.  There was some abdominal tenderness on physical examination and the diagnosis was regional enteritis of the small and large intestines.  Further testing was ordered and plaintiff was prescribed Darvocet.  A colonoscopy done by Dr. Brenner on August 28, 2008 revealed stenosis at the terminal ileum which prevented the test from being completed.  Plaintiff received another Remicade treatment on October 24, 2008.  The following day, she appeared for the hearing before the ALJ.  At that hearing, plaintiff testified to daily bouts of diarrhea requiring 9 to 10 restroom visits per day and Crohn's attacks at a rate of 5 times per week.  For the first time, plaintiff indicated that she wore protective undergarments to minimize the possibility of soiling her clothes although that still occurred. Plaintiff's stated weight at the time of the hearing was 150 pounds. The ALJ subsequently issued her unfavorable decision on February 9, 2009.  Plaintiff would be seen by Dr. Brenner on one final occasion on March 11, 2009 for complaints of fatigue, abdominal pain, and constipation with blood in the stool. By this time, the use of Remicade had been discontinued and there was mild tenderness to the right lower quadrant upon physical examination.  The diagnosis was regional enteritis of the small and large intestines.

In determining whether medical improvement has occurred, the Court must compare the medical evidence which led to the award of

benefits with the evidence that was produced in connection with the Administration's CDR process.   Having done so, contrary to plaintiff's present assertion substantial evidence supports the ALJ's determination that she experienced medical improvement by June 1, 2007 and was, therefore, no longer disabled. Undoubtedly, the deciding factor that led to the award of benefits in April of 2002 was the ALJ's finding, based upon the results of the consultative evaluation preformed by Dr. Doyle, that plaintiff needed constant, unpredictable access to the restroom due to daily bouts of bloody diarrhea.   In doing so, the ALJ roundly rejected the opinion of the state agency medical consultant that plaintiff could perform light-level work in light of the "uncontroverted fact" of plaintiff's need for restroom access as was reported to and accepted by the Administration's own consultative evaluator. Corroborative of that was plaintiff's loss of 20 pounds over a 7-month period preceding the award of benefits. As far as the record reflects, following the award of benefits plaintiff received no medical care until over 3 years later.   She obtained Crohn's related treatment at the ER in May and July of 2005. Plaintiff was seen at the NOMC ER on 2 other occasions in early July but those were largely unrelated to Crohn's.   A year would pass before plaintiff received additional care for Crohn's disease when she was admitted to NOMC for a 3-day course of fluids and steroids in

45

August of 2006.  Notably, plaintiff had no diarrhea at that time.
No further Crohn's-specific treatment was received by plaintiff
prior to her consultative evaluation by Dr. Mandich on May 17, 2007
when her weight was measured at 147 pounds.  Plaintiff disavowed
the existence of diarrhea at that time and the presenting complaint
was instead constipation.  The CDR process was completed only weeks
later.

Based upon a comparison of the medical evidence that was
generated prior to the CDR with that which was compiled in
connection with the CDR process it is apparent that the primary,
practical obstacle that impacted her ability to complete a normal
workday on a sustained basis, i.e., daily episodes of diarrhea
requiring constant and unpredictable access to a restroom, was no
longer present.  With treatment, plaintiff's Crohn's disease was
relatively well-controlled subsequent to the CPD and her psoriasis
was not sufficiently disabling to preclude the performance of
light-level work.  While plaintiff's Crohn's disease was a
complicating factor during her pregnancy, that circumstance was
short-term by its very nature.  The limitations and symptoms that
were testified to by plaintiff at the administrative hearing were
deemed to be only partially credible when weighed against the
objective medical evidence which is a responsibility that is
entrusted to the ALJ in the first instance.  <u>Carrier v. Sullivan</u>,

940 F.2d 942, 945 (5th Cir. 1991); <u>Selders v. Sullivan</u>, 914 F.2d 614, 618 (5th Cir. 1990); <u>Chaparro v. Bowen</u>, 815 F.2d 1008, 1010 (5th Cir. 1987).   Although plaintiff testified to restroom visits at twice the frequency of that which led to the award of benefits, her stated weight was 150 pounds and there was no significant weight loss like there had been prior to the CPD.   Substantial evidence supports the ALJ's determination that plaintiff had experienced medical improvement.

Plaintiff's third challenge to the Commissioner's decision is that the ALJ's finding that medical improvement was related to her ability to work is not supported by substantial evidence. Plaintiff argues that the ALJ impermissibly relied on a lack of weight loss as evidence of a decrease in the severe, frequent diarrhea that was present at the time of the CPD; that she was experiencing alternating bouts of diarrhea and constipation at the time of the CPD; and, that a decrease in the frequency of diarrhea accompanied with  an increase in constipation does not equate with an increase in the  ability to work on a regular and continuing basis.   Here, again, the Court disagrees.

A reading of the ALJ's favorable decision of April 24, 2002 reveals that he accepted as an "uncontroverted fact" plaintiff's report to Dr. Doyle that she suffered from bloody diarrhea up to 5 times per day requiring constant, unpredictable access to a

47

restroom that would, from a practical standpoint, prevent her from working on a regular and continuing basis. Corroboration of the existence of such daily occurrences was plaintiff's loss of 20 pounds in the roughly 7-month period preceding the CPD. By contrast, in none of the medical records that were generated subsequent to the CPD did plaintiff complain of diarrhea occurring with sufficient frequency to amount to a daily disruption in a work schedule. Included in those were records from the EJGH ER in which plaintiff reported that her last bowel movement had been normal, NOMC records from August of 2006 which were negative for diarrhea, and Dr. Mandich's consultative report in which plaintiff disavowed the existence of diarrhea. Indeed, other than plaintiff's hearing testimony, the only mention of diarrhea that appears in the records that were generated subsequent to the CPD was in the "Disability Report-Appeal" form that she completed on November 15, 2007 at a time when her regular medications had been discontinued due to her pregnancy.

No diarrhea-related complaints were noted in any of the NOMC records that followed but plaintiff admittedly received treatment for constipation at NOMC on 3 occasions within a month of the birth of her third child. No complaints of diarrhea or constipation were voiced to Dr. Brenner at the time of his subsequent evaluation on August 13, 2008. While plaintiff testified to daily diarrhea,

restroom visits at a rate of 9 to 10 per day, and the use of protective, disposable undergarments, that testimony lacks sufficient objective support. Plaintiff cites the first page of Dr. Mandich's consultative report as evidence of the use of enemas twice per week but the Court's review of that report reveals no mention of that form of treatment but instead notes that plaintiff used glycerine suppositories twice per week to facilitate bowel movements. Contrary to plaintiff's present assertions, the ALJ's findings regarding the presence of diarrhea was not simply based on a lack of weight loss. Rather, the absence of such daily episodes that would be disruptive of regular work activity was derived from the records of the doctors who had treated or evaluated plaintiff. Without evidence of such daily occurrences, the ALJ could logically conclude that there would be no erosion of the available work base. The ALJ's finding that plaintiff's medical improvement was related to her ability to work was supported by substantial evidence.

In her fourth and final challenge to the Commissioner's decision plaintiff argues that the ALJ failed to fully and fairly develop the record and that the AC failed to assume jurisdiction when presented with new and material evidence in the form of Dr. Brenner's final treatment note from March 11, 2009.

An ALJ has a duty to fully and fairly develop the facts relating to claimant's application for DIB which, if breached,

results in insufficient facts upon which to make an informed decision that is supported by substantial evidence. Ripley v. Chater, 67 F.3d 552, 557 (5th Cir. 1995); Pierre v. Sullivan, 884 F.2d 799, 802 (5th cir. 1989); Kane v. Heckler, 731 F.2d 1216, 1219 (5th Cir. 1984). This basic obligation is heightened when a claimant who is unrepresented by counsel and is unfamiliar with the hearing process appears before an ALJ. Kane, 731 F.2d at 1219-20. The failure of an ALJ to develop an adequate record is not, however, per se grounds for reversal. Id. Reversal of the ALJ's decision is appropriate only if the claimant can show that he was prejudiced thereby. Ripley, 67 F.3d at 557. "Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision." Id. at 557 n. 22.

After submitting her request for a hearing before an ALJ, plaintiff was sent an acknowledgment letter which advised her, inter alia, of her right to be represented by an attorney or other person and included a list of organizations that provide free legal representation to qualified individuals and referrals to private practitioners in the field. (Tr. pp. 166-168). On September 20, 2008, plaintiff was sent notice that the hearing would go forward on October 24, 2008. (Tr. pp. 173-180). That notice again reminded plaintiff of her right to obtain representation. (Id.). Plaintiff

received the notice of hearing on September 21, 2008. (Tr. p. 182).

As noted earlier, on October 24, 2008, plaintiff appeared for the hearing without representation and elected to proceed pro se after being duly questioned by the ALJ.  At the conclusion of the hearing, the ALJ had plaintiff sign a second authorization form to obtain her most recent medical records from Dr. Brenner, stating that she would not make her decision until she received them. (Tr. p. 512).  Consistent with that representation, on October 27, 2008, the Administration corresponded with Dr. Brenner's office and requested plaintiff's updated medical records. (Tr. pp. 380-381). Unfortunately, no such records were forthcoming from Dr. Brenner's office.  After waiting until February 2, 2009, the ALJ issued her written decision terminating plaintiff's Social Security benefits. By March 14, 2009, plaintiff had secured counsel who requested review of the ALJ's decision by the AC. (Tr. pp. 15-16).  At some point, counsel obtained plaintiff's updated medical records from Dr. Brenner and submitted them to the AC for its review by correspondence dated April 23, 2009. (Tr. pp. 465-482).  On March 30, 2010, the AC formally made Dr. Brenner's updated treatment notes a part of the record and, after considering same and a letter brief from plaintiff's counsel, denied plaintiff's request for review that same day. (Tr. pp. 12, 9-11).

Based on a review of the foregoing, it is apparent that the

51

ALJ complied with her duty to develop the record. Demand was made upon Dr. Brenner's office for updated medical records but none were forthcoming. The updated treatment notes from Dr. Brenner were ultimately obtained by plaintiff's counsel and were made part of the record and were considered by the AC as it was required to do. See Higginbotham v. Barnhart, 405 F.3d 332, 337-38 (5th Cir. 2005). Those updated treatment records did not alter the outcome of plaintiff's case; noticeably absent from those records was the critical factor that had led to the award of benefits in 2002: the presence of bloody bowel movements up to 5 times per day that required constant, unpredictable access to a restroom.

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

52

New Orleans, Louisiana, this __22nd__ day of ____June____, 2011.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE